IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **WHITE ROSEBAY SHIPPING S.A.,** § | CIVIL ACTION NO. 2:12-cv-096 |
| § | |
| **Plaintiff,** § | |
| VS. § | |
| § | |
| **HNA GROUP CO. LTD., HONG KONG** § | (Pursuant to Rule 9(h) of the |
| **CHAIN GLORY LTD., GRAND CHINA** § | |
| **SHIPPING DEVELOPMENT CO. a/k/a** § | Federal Rules of Civil Procedure) |
| **SHANGHAI GRAND CHINA SHIPPING** § | |
| **DEVELOPMENT CO., OFFSHORE HEAVY** § | |
| **TRANSPORT AS, and OHT OSPREY AS** § | |
| § | |
| **Defendants.** § | ADMIRALTY |

## ORIGINAL VERIFIED COMPLAINT

Plaintiff WHITE ROSEBAY SHIPPING S.A. ("**WHITE ROSEBAY**" or "**Plaintiff**"), by its undersigned counsel, as and for its Original Verified Complaint against the Defendants: HNA GROUP CO. LTD., HONG KONG CHAIN GLORY LTD., GRAND CHINA SHIPPING DEVELOPMENT CO. a/k/a SHANGHAI GRAND CHINA SHIPPING DEVELOPMENT CO., OFFSHORE HEAVY TRANSPORT AS, and OHT OSPREY AS (collectively, "Defendants"), respectfully alleges and pleads the following:

### I. JURISDICTION, VENUE AND PARTIES

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract i.e. an executed time charter party for the employment of a seagoing cargo vessel and a principal obligor's performance guarantee. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provision of Rule B of the

Supplemental Rules For Certain Admiralty and Maritime Claims, and the Federal Arbitration Act, 9 U.S.C. §§ 4 and 8 in aid of maritime arbitration.

2.At all times material hereto, Plaintiff WHITE ROSEBAY was and still is a foreign business entity organized under the laws of Panama.

3.At all times material hereto Defendant HNA GROUP CO. LTD. ("**HNA**") is and was a foreign corporation organized under the laws of a foreign country believed to be the People's Republic of China.

4.At all times material hereto Defendant HONG KONG CHAIN GLORY LTD. ("**CHAIN GLORY**") was and is a foreign company organized under the laws of a foreign country believed to be the British Virgin Islands.

5.At all times material hereto Defendant GRAND CHINA SHIPPING DEVELOPMENT CO. a/k/a SHANGHAI GRAND CHINA SHIPPING DEVELOPMENT CO. ("**GC DEVELOPMENT**") was and is a foreign company organized under the laws of a foreign country believed to be the People's Republic of China.

6.At all times material hereto non-party GRAND CHINA LOGISTICS HOLDING (GROUP) COMPANY LIMITED ("**GRAND CHINA LOGISTICS**") was and is a foreign holding company organized under the laws of the People's Republic of China.  GRAND CHINA LOGISTICS is a holding company through which HNA operates its shipping business.

7.At all times material hereto Defendant OFFSHORE HEAVY TRANSPORT AS ("**OHT**") was and is a foreign corporate entity organized under the laws of Norway.

8.At all times material hereto Defendant OHT OSPREY AS ("**OHT OSPREY**") was and is a foreign corporate entity organized under the laws of Norway and the registered owner of the specialized heavy lift vessel M/V OSPREY, bearing IMO No. 8616568 and

international call sign LAEL7, a specialized heavy lift motor vessel that is or will soon be within the Port of Corpus Christi, and is expected to berth at Kiewit Offshore Services, Ltd., located at 2440 Kiewit Road, Ingleside, Texas, 78362.

9. The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, including the M/V OSPREY, as well as freight payable by garnishee Ensco Plc in connection with the M/V OSPREY's current voyage that is a debt owed to one or more of the Defendants, both of which are subject to attachment under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions.

## II.  THE SUBSTANTIVE CLAIMS

10. This is an action to obtain security for Plaintiff's claims arising out of breaches of a time charter party ("**Charter Party**") of the vessel M/V FORTUNE PLUM between Plaintiff WHITE ROSEBAY and defendant CHAIN GLORY.  CHAIN GLORY's performance of the Charter Party was guaranteed by Defendant GC DEVELOPMENT.  A true and correct copy of the Charter Party is attached hereto as Exhibit 1.

11. The Charter Party began on July 23, 2010, when the vessel M/V FORTUNE PLUM was delivered to CHAIN GLORY.

12. The charter rate was $17,700 per day.  CHAIN GLORY was obligated to make charter hire payments each month.

13. In sum, beginning in April 2011, CHAIN GLORY missed payment of multiple installments of charter hire due, each of which constituted a default under the Charter Party.

14. Despite CHAIN GLORY's making various late, partial payments – sometimes on pain of withdrawal of the M/V FORTUNE PLUM from CHAIN GLORY's use – by September

of 2011, the sum of $1,050,711.00 in back-charter-hire was due and owing. Soon thereafter, CHAIN GLORY stopped making charter hire payments entirely.

15. On October 13, 2011, WHITE ROSEBAY made a statutory demand that CHAIN GLORY be wound up under BVI law.

16. During this same time period, WHITE ROSEBAY exercised its contractual rights to receive charter hire directly from CHAIN GLORY's sub-charterers, and thereby reduced the overdue charter hire outstanding to $592,756.64.

17. By November, 2011, it became clear that CHAIN GLORY had constructively repudiated the M/V FORTUNE PLUM charter. WHITE ROSEBAY accepted this repudiation and withdrew the M/V FORTUNUE PLUM from the service of CHAIN GLORY on November 14, 2011.

18. On November 14, 2011 there were a minimum of 587.71 days remaining on the Charter Party, at a contracted rate of $17,700 per day. In order to mitigate its losses, WHITE ROSEBAY re-fixed the vessel to a new charterer under a new charter, but did so at a contract loss – a net average day rate of $9,674.51.

19. The difference between the contracted hire rate for the M/V FORTUNE PLUM and the mitigation rate amounts to $4,270,643.62.

20. Additionally, WHITE ROSEBAY was required to incur $28,500 in damages related to recovery of the sub-hire referenced above.

21. As a result of CHAIN GLORY's failure to pay hire under the Charter Party and their repudiation of the Charter Party, WHITE ROSEBAY has suffered damages in the principal amount of $4,891,900.26.

22. Pursuant to the Charter Party, WHITE ROSEBAY has commenced arbitration

against CHAIN GLORY in London, and has presented a claims submission ("**Claims Submission**") to the panel. A true and correct copy of the Claim Submission, which fully details the circumstances of CHAIN GLORY's breach, repudiation, and resultant damages is attached hereto as Exhibit 2.

23. WHITE ROSEBAY shall soon commence litigation against guarantor GC DEVELOPMENT in the High Court of London under their guarantee of the Charter Party.

24. This action is commenced both as an ancillary proceeding to the London arbitration and the London High Court proceedings, brought in order to obtain security for Plaintiff's claims in those proceedings, as well as a primary proceeding against the remaining Defendants.

25. With respect to the security sought in connection with the London arbitration and London High Court proceedings which eventually will be sought to be enforced against the security obtained in this proceeding, interest, costs and attorneys' fees are routinely awarded to the prevailing party in both London High Court proceedings and in London arbitrations as a part of English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

26. As best as can now be estimated, Plaintiff WHITE ROSEBAY expects to recover the following amounts in London Arbitration from Defendant CHAIN GLORY:

| | | |
|---|---|---|
| A. | Principal Claim: | $4,891,900.26 |
| B. | Estimated interest on Principal Claim:<br>*3.0 years at 6.0%, compounded quarterly* | $956,944.58 |
| C. | Estimated attorneys' fees: | $425,000.00 |
| D. | Costs of Tribunal: | $ 75,000.00 |
| D. | **TOTAL:** | **$6,348,844.84** |

5

27. Therefore, WHITE ROSEBAY's total claim for breach of the maritime contract against Defendant CHAIN GLORY, which it seeks to apply against Defendant GC DEVELOPMENT as guarantor and against the remaining Defendants (either as alter egos or through veil-piercing) totals **$6,348,844.84**.

### III. DEFENDANTS' CORPORATE IDENTITY

28. Notwithstanding their formal separate incorporation, the Defendants actually constitute a single business enterprise pursuing their business objectives through nominally separate business structures, all of which are dominated and controlled by the principal HNA, and a parent company of Defendants: CHAIN GLORY, GC DEVELOPMENT and OHT.

29. As set forth in detail below, HNA and non-party GRAND CHINA LOGISTICS have misused technically distinct subsidiaries, including defendants CHAIN GLORY, GC DEVELOPMENT and OHT so that they could place "riskless" bets in the shipping marketplace.

30. To wit, defendants CHAIN GLORY and GC DEVELOPMENT were formed in 2008-2009 - i.e. *after* the approximately 95% crash in freight-rates following the collapse of Lehman Brothers and the subsequent world-wide recession connected with the sub-prime mortgage crisis. There has been no analogous "crash" in the shipping market since then. As such, it is apparent that defendants CHAIN GLORY and GC DEVELOPMENT were set up to bet on the shipping market's recovery. When it became apparent that this "bet" was not paying off as hoped, HNA and non-party GRAND CHINA LOGISTICS simply have eliminated these entities' funding to allow them to "die on the vine," leaving their creditors with valueless claims. Hence, the current wave of Grand China/HNA-related defaults – there are numerous lawsuits which have been brought over the course of the last few months by counter-parties of companies

in the HNA/GRAND CHINA LOGISTICS family – is of HNA/GRAND CHINA LOGISTICS' own making and design.

31.     The structure and the corporate interrelationships of the Defendants noted in the foregoing are laid out in the "PowerPoint" corporate prospectus issued by representatives of Defendant HNA and non-party GRAND CHINA LOGISTICS to Plaintiff specifically in order to induce Plaintiff into entering the subject agreement with CHAIN GLORY and GC DEVELOPMENT.  A paper copy of this prospectus is attached hereto as Exhibit 3.

32.     The HNA-GRAND CHINA LOGISTICS prospectus represents HNA and non-party GRAND CHINA LOGISTICS as an asset-rich corporate conglomerate which, in addition to the above noted business enterprises, also owns the following companies: (a) Air cargo transportation company Yangtze River Express Airlines Co. Ltd; (b) Marine transportation companies: Tianjin Marine Shipping Co., Ltd and Grand China Shipping (Yantai) Co., Ltd; (c) Shipyards Jinhai Heavy Industry Co. Ltd. (a business with a capital of up to 18 billion RMB) and Jinghai Industry Co. Ltd. (a company with a total investment of RMB .98 billion).  *See Exhibit 3 at 6-9.*

33.     In this prospectus, it is represented that GRAND CHINA LOGISTICS manages, in some capacity, HNA's maritime transportation and logistics portfolio, which include several separate subsidiary companies – notably Defendants CHAIN GLORY and GC Development as well as Defendant OHT – all of which HNA controls and dominates .  *See Exhibit 3 at 3, 6.*

34.     It is represented in the same prospectus that HNA/GRAND CHINA LOGISTICS controls 50 ships and owns 9 aircraft.  *See Exhibit 3 at 3.*

35. It is also represented in the same prospectus that HNA/GRAND CHINA LOGISTICS owns: five (5) shipping companies, two (2) shipyard enterprises, one (1) cargo airline company, three (3) port companies and one (1) logistics company. *See Exhibit 3 at 6*.

36. It is represented in the same prospectus that the shipping companies owned by HNA/GRAND CHINA LOGISTICS include the Defendants CHAIN GLORY and GC DEVELOPMENT among many others *See Exhibit 3 at 6, 9*.

37. Defendant CHAIN GLORY, which chartered the MV FORTUNE PLUM from WHITE ROSEBAY is represented in the HNA/GRAND CHINA LOGISTICS prospectus as follows:

> founded in Hong Kong in November, 2007
> - ship coal, ore, construction materials in bulk for energy and construction clients
> - bulk shipping focus on Australia, South America and Indonesia market, plans to reach 30 bulk carriers with the combination of Cape, PMX and Handy
> - break bulk shipping focus on Western Africa and China-Japan-Koera market, currently controls 7 carriers and plans to reach 10 carriers

*See Exhibit 3 at 9.*[1]

38. Defendant GC DEVELOPMENT which guaranteed CHAIN GLORY's performance in connection with the M/V FORTUNE PLUM Charter Party is described in the HNA/GRAND CHINA LOGISTICS prospectus as follows: " a 'well-funded' entity raised by GCL with China coastal shipping competence." *See Exhibit 3 at 9*.

39. This same "well-funded" representation as to GC DEVELOPMENT was repeated by HNA/GRAND CHINA LOGISTICS brokers to Plaintiff in emails in order to convince

---

[1] The fact that CHAIN GLORY is represented as a Hong Kong entity constitutes yet-another example of GRAND CHINA LOGISTICS' abuse of the corporate form vis-à-vis its counterparties. CHAIN GLORY is a ***British Virgin Islands*** entity, not a ***Hong Kong entity***. Because of, for example, corporate obscurity provided by British Virgin Islands laws, the counter-party risks associated with doing business with a British Virgin Islands entity are significantly higher than as compared to a Hong Kong entity. But GRAND CHINA LOGISTICS represented CHAIN GLORY as a Hong Kong entity, presumably to induce counter-parties to contract with CHAIN GLORY.

8

Plaintiff to enter the Charter at issue subject to GC DEVELOPMENT's guarantee. A true and correct copy of this email is attached hereto as Exhibit 4.

40. Plaintiff specifically relied upon the representations that GC DEVELOPMENT was both "well funded" and "raised by GCL" when agreeing to the M/V FORTUNE PLUM charter with CHAIN GLORY and guaranteed by GC DEVELOPMENT.

41. Plaintiff's investigation has revealed that a significant part of the logistics business of HNA/GRAND CHINA LOGISTICS is ocean transportation which includes: "dry bulk" cargo transportation via its dominated subsidiaries – defendants CHAIN GLORY and GC DEVELOPMENT. A diagram of the logistics business structure and operations operated by HNA/GRAND CHINA LOGISTICS is attached hereto as Exhibit 5.

42. Defendants CHAIN GLORY and GC DEVELOPMENT are under the total beneficial ownership, management and control of HNA/GRAND CHINA LOGISTICS. Moreover, defendants CHAIN GLORY and GC DEVELOPMENT publicly represent and hold themselves out as branches of HNA/GRAND CHINA LOGISTICS, utilizing HNA logos, symbols and colors in their advertising. *See Exhibit 3*.

43. It has become clear to Plaintiff during the past nine months that HNA/GRAND CHINA LOGISTICS misrepresented the capitalization and financial wherewithal of GC DEVELOPMENT in order to wrongfully induce Plaintiff into a "heads I win, tails you lose" deal.

44. It has become clear to Plaintiff over the course of the Charter Party and in connection with ongoing dispute negotiations that the HNA/GRAND CHINA LOGISTICS subsidiaries such as Defendants CHAIN GLORY and GC DEVELOPMENT exist only by virtue of perpetual life support from HNA – which support can be and is withdrawn at will.

45. When a subsidiary is profitable, it receives operational funding and funnels profits up the subsidiary chain. When a subsidiary has been deemed unprofitable, the "plug is pulled" and operational funding is denied. Solely by way of example, attached hereto as Exhibit 6 is a true and correct copy of an HNA/GRAND CHINA LOGISTICS broker's email to Plaintiff explaining how an expected "cash injection" failed to materialize. Upon information and belief, such "cash injections" were the monetary life support that periodically were provided to CHAIN GLORY and GC DEVELOPMENT for them to continue to operate until such time as HNA/GRAND CHINA LOGISTICS decided to "pull the plug."

46. The result has been, and continues to be, a pre-planned series of defaults by HNA/GRAND CHINA LOGISTICS subsidiaries, including Defendants CHAIN GLORY and GC DEVELOPMENT, which defaults have made global headlines. Attached hereto as Exhibit 7 are true and correct copies of a series of newspaper articles describing these defaults – including a public ultimatum by the shipping community to the HNA/Grand China group to disclose its financial status or forever lose credibility.

47. The same pattern of charter party repudiations has recurred with several other parties which have chartered to HNA/GRAND CHINA LOGISTICS-dominated subsidiaries. In these, HNA/GRAND CHINA LOGISTICS has serially repudiated similar undertakings as performance guarantor leading to a multiplicity of claims and litigation around the world.

48. In the conduct of their ocean transport and dry bulk business with chartered-in, non-owned tonnage, HNA/GRAND CHINA LOGISTICS does not directly contract as charterers with the respective owners, but use other, financially weak, entities of the group such as Defendants CHAIN GLORY and GC DEVELOPMENT, which it represented were financially strong, but systematically dishonor their guarantee undertaking.

49.     Defendants as a matter of practice pay off each other's debts using the bank accounts of other controlled subsidiaries within the group.  Moreover, Defendants routinely guarantee the performance of each other's obligations.

50.     HNA/GRAND CHINA LOGISTICS routinely commingles and confuses their own business with the business of their subsidiaries, to such an extent that they are inseparable and indistinguishable.

51.     For example, in connection with the very charter at issue in this dispute, it is apparent that Defendants CHAIN GLORY and GC DEVELOPMENT have significantly commingled their assets and funds.

52.     As noted above, WHITE ROSEBAY chartered the M/V FORTUNE PLUM to CHAIN GLORY subject to GC DEVELOPMENT's guarantee.  In turn, as is common in the shipping industry, the M/V FORTUNE PLUM was sub-chartered to North China Shipping Ltd.

53.     However, the signatory to the M/V FORTUNE PLUM subcharter with North China Shipping Ltd. is and was GC DEVELOPMENT, not CHAIN GLORY.  Under proper corporate formalities, the only entity which could sub-charter the M/V FORTUNE PLUM was CHAIN GLORY, because CHAIN GLORY was the party which chartered the M/V FORTUNE PLUM from Plaintiff.  Nevertheless, GC DEVELOPMENT held itself out as having the authority to sub-charter the M/V FORTUNE PLUM even though CHAIN GLORY should have been the only party with that authority

54.     Similarly, it is apparent that GC DEVELOPMENT, not CHAIN GLORY, collected the sub-hire payments in connection with the M/V FORTUNE PLUM – payments which GC DEVELOPMENT should not be entitled to collect if corporate formalities were being observed.  Attached hereto as Exhibit 8 is a true and correct copy of the fixture recap as between

GC DEVELOPMENT and North China Shipping.  It clearly describes GC DEVELOPMENT, not CHAIN GLORY as "owner."  Plaintiff's investigation has revealed such behavior is routine.

55. For example, it is apparent that defendant CHAIN GLORY made a $2.05M settlement payment on behalf of non-party (but another GRAND CHINA LOGISTICS subsidiary) Grand China Yantai.  Attached hereto as Exhibit 9 are copies of correspondence and wire transfer records evidencing this payment.

56. It is similarly apparent that non-party (but another GRAND CHINA LOGISTICS subsidiary) Grand China Shipping (HK) Co. Ltd. made a $297,000 payment on behalf of Grand China Yantai.  Attached hereto as Exhibit 10 are copies of correspondence and wire transfer records evidencing this payment.

57. Next, GRAND CHINA LOGISTICS often contracts as co-obligor of its subsidiaries (non-defendants) Grand China Shipping (Yantai) Co. Ltd. and Ocean Container Trading (Hong Kong) Co., Ltd.  *See* copies of container leasing contracts attached hereto as Exhibit 11 and 12.

58.  Meanwhile, Ocean Container Trading (HK) Company Limited, a non-defendant in this action but a self-described "sub-company" of GRAND CHINA LOGISTICS is apparently bound by the same corporate officer's signature *(see copy of container leasing contract attached hereto as Exhibit 12)*, and apparently used its bank accounts with HSBC to pay off container leasing invoices on behalf of GRAND CHINA LOGISTICS *(see bank transfer credit note attached to Exhibit 12)*, even though Ocean Container Trading (HK) Company Limited is not a party to the container leasing contract *(see contract attached to Exhibit 12)*, and the party actually invoiced was GRAND CHINA LOGISTICS *(see invoice copy attached to Exhibit 12)*.

59. Plaintiff's investigations have revealed that the M/V OSPREY, a specialized

heavy lift vessel, that is presently (or expected shortly) to be within the port of Corpus Christi, is an asset which is beneficially owned by HNA through GRAND CHINA LOGISTICS and its subsidiary Defendant OHT which in turn wholly owns Defendant OHT OSPREY AS. Attached hereto as Exhibit 13 are true and correct copies of Norwegian corporate documentation demonstrating GRAND CHINA LOGISTICS' shareholding interest of defendant OHT.

60. As such, OHT is now a corporate sibling of primary defendants CHAIN GLORY and GC DEVELOPMENT. Whereas CHAIN GLORY and GC DEVELOPMENT handle HNA's box and bulk cargo business, OHT now handles HNA's heavy-lift and transport business.

61. Though Defendants comprise nominally separate corporate legal entities, their ownership and control is so intertwined and fused that they are distinct from one another only in a *pro forma* manner.

62. Throughout the performance of the M/V FORTUNE PLUM charter party, it became increasingly evident that CHAIN GLORY and GC DEVELOPMENT lacked both economic independence and corporate autonomy and each was unable to make their own financial decisions that affect their conduct of business. Instead, such decisions are being made for them by the holding companies that entirely dominate them, i.e. GRAND CHINA LOGISTICS and HNA. Thus, Defendants CHAIN GLORY and GC DEVELOPMENT were and are entirely dependent on GRAND CHINA LOGISTICS and HNA for funds in order to meet their hire payment obligations to Plaintiff, and are only nominally independent, continually requiring cash infusions from the controlling and dominating parent companies in order to meet their ongoing obligations.

63. Though Defendants represented themselves as a multi-billion dollar conglomerate business enterprise, *(see e.g. Exhibit 3 at 3, 6, 12, 14, 15)* in actual fact HNA/GRAND CHINA

LOGISTICS' various subsidiaries, including CHAIN GLORY and GC DEVELOPMENT are severely undercapitalized.

64. At all times material hereto the structure of the Defendants and their affiliated companies was a complex intertwined web of parent and subsidiary companies over which HNA/GRAND CHINA LOGISTICS exercised virtually absolute dominion and control and constituted their subsidiaries: CHAIN GLORY, GC DEVELOPMENT and OHT as their *alter egos*.

65. HNA and non-party GRAND CHINA LOGISTICS dominate and control defendant OHT.

66. On September 30, 2010 Defendant GRAND CHINA LOGISTICS acquired 60% (sixty percent) of the shares of Defendant OHT which was thereby made a subsidiary of HNA/GRAND CHINA LOGISTICS.  Grand China's own website described this process as a "merger" between GRAND CHINA LOGISTICS and OHT.  A true and correct copy of the relevant page of GRAND CHINA LOGISTICS' website is attached hereto as Exhibit 14.

67. As part of the merger, GRAND CHINA LOGISTICS and GRAND CHINA LOGISTICS ' parent, HNA, installed their own directors on OHT's board of directors.  A true and correct copy of Norwegian documents describing OHT's new board composition is attached hereto as Exhibit 15.

68. To wit, the Chairman of OHT's Board is Mr. Jia Hongxiang, who is also the Executive Chairman and President of GRAND CHINA LOGISTICS.  Attached hereto as Exhibit 16 is a true and correct copy of the relevant page from GRAND CHINA LOGISTICS' website describing Mr. Hongxiang's role at GRAND CHINA LOGISTICS.

69. Similarly, the other new member of OHT's Board is Mr. Jiang Wen, who is also Vice Chairman of the Board of Directors of HNA Group, GRAND CHINA LOGISTICS' parent company, and a "principal leader and decision maker of HNA Group." Attached hereto as Exhibit 17 is a true and correct copy of the relevant page from HNA Group's website describing Mr. Wen's role at HNA.

70. The vessel OSPREY is the sole asset of Defendant OHT OSPREY AS and at least 60% of the equitable and beneficial interest in same is the property of Defendants by virtue of GRAND CHINA LOGISTICS' 60% legal, equitable, and beneficial ownership of OHT.

71. As set forth more fully above, at all times material hereto GRAND CHINA LOGISTICS was and remains a mere holding company that operates HNA's business in various areas of the logistics and transportation business through a number of corporate subsidiaries. The corporate subsidiaries consist of a wide array of entities carrying on business in the corporate form with some being asset-rich or capital-rich while others are asset-poor and/or capital poor. Whether a company controlled by HNA/GRAND CHINA LOGISTICS is in the capital-rich or capital-poor category of companies depends, to a large extent, on whether controlling company HNA allocate funds to it to meet its ongoing obligations.

72. Thus, the subsidiaries of HNA, including GRAND CHINA LOGISTICS and its subsidiaries such as Defendants CHAIN GLORY and GC Development, are financially dependent, and financially dominated and controlled by HNA. From Plaintiff's experience over the course of the performance of the time charter party, it has become evident to Plaintiff that Defendants, in actual practice have consistently pursued business as a single business entity, confusing and commingling assets, officers, directors, and finances, holding themselves out to

15

the public to be a single business and a "Group," guaranteeing the obligations of each other, and in every respect acting as an integrated single business enterprise. *See Exhibit 3*.

73. Defendants CHAIN GLORY and GC DEVELOPMENT which are entirely owned by non-party GRAND CHINA LOGISTICS are cash-starved because the controlling parent companies that dominate them - i.e. Defendant HNA - refuse to allocate the cash needed by them to meet the obligations they contracted for the ultimate benefit of the parent company HNA.

74. The test used by non-party GRAND CHINA LOGISTICS and Defendant HNA in deciding whether or not to fund a subsidiary is simple. If the particular market in which the subsidiary operates is profitable, the obligations to the subsidiary's creditors are honored. If the market in which the subsidiary operates is not profitable the subsidiary is not funded and its contractual obligations are repudiated.

75. Operating in this manner, HNA has dominated and manipulated its subsidiaries, Defendants CHAIN GLORY and GC DEVELOPMENT, by failing to adequately capitalize them and provide them the necessary operating funds and has thereby brought them to the brink of insolvency and to their repudiation of their charter parties with Plaintiff WHITE ROSEBAY.

76. By contrast, since OHT is operating in a profitable niche market, it realizes earnings and is profiting to the ultimate benefit of Defendants.

77. Thus HNA and its subsidiaries, which include non-party holding company GRAND CHINA LOGISTICS and Defendants CHAIN GLORY, GC DEVELOPMENT and OHT, are part of and comprise a single business enterprise which is used by the said parent companies abusively in order to defraud creditors or commit other unjust acts i.e. as a variation of a shell game in which the companies that are indebted to Plaintiff are not allowed the cash

they need in order to stay in business, Defendant HNA and non-party GRAND CHINA LOGISTICS refuse to allow Defendants CHAIN GLORY and GC DEVELOPMENT to honor their obligations, but nevertheless has substantial assets in its subsidiary OHT, including the vessel OSPREY in which they have a 60% equity interest.

## IV. APPLICATION FOR ATTACHMENT UNDER SUPPLEMENTAL ADMIRALTY RULE B

78. None of the Defendants are present or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims. *See Attorney Declaration of W. Sean O'Neil attached hereto as Exhibit 18.* Nevertheless, Defendants have within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of debts, credits, or effects.

79. More particularly the M/V OSPREY, bearing IMO No. 8616568 and international call sign LAEL7, a specialized heavy lift motor vessel owned by Defendants, is or will soon be within the Port of Corpus Christi, and is expected to berth at Kiewit Offshore Services, Ltd., located at 2440 Kiewit Road, Ingleside, Texas, 78362.

80. Aboard the M/V OSPREY is an oil rig owned by garnishee Ensco Plc (which maintains offices in Texas). The M/V OSPREY is delivering the oil rig to Corpus Christi for Ensco Plc and as such, it is highly likely that Ensco Plc currently owes a freight payment (i.e. an attachable debt) to defendant OHT. The Ensco Plc debt to OHT is attachable pursuant to Rule B in the Southern District of Texas.

81. Defendants have used and are continuing to use their purported corporate separateness, and the purported separate incorporation of CHAIN GLORY and GC

DEVELOPMENT abusively, to wit: to engage in fraudulent trading practices and avoid paying damages for the repudiation of the M/V FORTUNE PLUM charter party agreement.

82. Defendants have contracted with Plaintiff using their impoverished and completely dominated surrogate shell entities CHAIN GLORY and GC DEVELOPMENT as alter egos, intending to reap the benefits but pay none of the costs. Defendants are accordingly, using the corporate form abusively, i.e. to perpetrate fraud and commit other injustice. It would be, accordingly, fair and equitable to pierce or reversely pierce the corporate veil of HNA and OHT, in order to reach the economic value of assets, i.e. the M/V OSPREY, which said Defendants have compartmentalized in separate corporate pockets, to the detriment of Plaintiff.

83. Alternatively, Defendants having operated, at all relevant times, as a single enterprise, and being the *alter ego* of each other in the circumstances set in the above and foregoing Original Verified Complaint, it would be fair and equitable for any asset of this enterprise to be subject to the claims of judgment creditors of the enterprise, such as Plaintiff, and for any such assets to be attached as security for Plaintiff's maritime claims.

## V. APPLICATION FOR ORDER AUTHORIZING IMMEDIATE DISCOVERY

84. As set forth above, the M/V OSPREY is owned by Defendant OHT, which is owned by non-party holding entity GRAND CHINA LOGISTICS, which is owned by Defendant HNA.

85. Upon information and belief, and is customary in the shipping industry, there is an onboard computer that the vessel master and crew utilizes for various purposes – including receiving operations instructions from owners and their affiliates.

86. This computer also will have access to the OHT and/or Grand China and/or HNA network for the purposes of payroll, scheduling and other operational-purposes. The information

located on the hard disk of the on-board computer, as well as the network-stored information accessible via that computer terminal, is critical to proving the alter-ego allegations herein, and is discoverable.

87. Based upon the foregoing, and in conjunction with the memorandum of law submitted herewith, WHITE ROSEBAY hereby requests that this Court enter an order authorizing expedited discovery with respect to the digital information contained in or accessible via the M/V OSPREY's on-board computer.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A. That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Verified Complaint;

B. That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including, but not limited to, the M/V OSPREY, freight or other payment in connection with the M/V OSPREY owed by Ensco Plc and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D. That judgment be entered against each of the Defendants in the sum of **$6,348,844.84**, together with interest and costs, and the proceeds of the assets attached be applied in satisfaction thereof;

E. That the Court issue the expedited discovery order with respect to the on-board computer of the M/V OSPREY; and

F. That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

**W. SEAN O'NEIL, ATTORNEY AT LAW**

*/s/ W. Sean O'Neil*
W. Sean O'Neil, Attorney-in-Charge
TBA No. 24033807; SDTX 24835
2000 S. Dairy Ashford Street, Suite 340
Houston, Texas 77077
Tel:   (281) 496-0193
Fax:   (281) 496-0680
Email: wsoneil@wsolaw.com
**Attorneys for Plaintiff,**
*White Rosebay Shipping S.A.*

**OF COUNSEL**
**HOLLAND & KNIGHT LLP**
Michael L. Frevola
31 West 52nd Street
New York, NY 10019
Tel:   (212) 513-3494
Fax:   (212) 385-9010
Email:  Michael.Frevola@hklaw.com